UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TONEY BROWN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 1:20-cv-01923-JRS-MJD |
| ) | |
| WARDEN, ) | |
| ) | |
| Respondent. ) | |

**Order Denying Petition for a Writ of Habeas Corpus
and Directing Entry of Final Judgment**

Indiana prison inmate Toney Brown petitions for a writ of habeas corpus challenging a prison disciplinary sanction imposed in disciplinary case number IYC 19-11-0220. For the reasons explained in this Order, Mr. Brown's habeas petition must be **denied**.

**A.   Overview**

Prisoners in Indiana custody may not be deprived of good-time credits or of credit-earning class without due process. *Ellison v. Zatecky,* 820 F.3d 271, 274 (7th Cir. 2016); *Scruggs v. Jordan,* 485 F.3d 934, 939 (7th Cir. 2007); *see also Rhoiney v. Neal,* 723 F. App'x 347, 348 (7th Cir. 2018). The due process requirement is satisfied with: 1) the issuance of at least 24 hours advance written notice of the charge; 2) a limited opportunity to call witnesses and present evidence to an impartial decision-maker; 3) a written statement articulating the reasons for the disciplinary action and the evidence justifying it; and 4) "some evidence in the record" to support the finding of guilt. *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985); *see also Wolff v. McDonnell,* 418 U.S. 539, 563-67 (1974).

### B.     The Disciplinary Proceeding

Indiana Department of Correction (IDOC) disciplinary case IYC 19-11-0220 began with an incident that occurred on October 20, 2019, when an offender had been seriously injured in an assault with a weapon. IDOC Investigator P. Prulhiere charged Mr. Brown with aiding in the assault of another offender with a weapon, a violation of the IDOC's Adult Disciplinary Process offense A-111/A-102. A disciplinary hearing was held but for reasons not relevant to this action the matter was reheard. It is the rehearing that is the subject of the instant habeas corpus petition.

For the rehearing, Investigator Prulhiere issued a new conduct report. Substantively, it repeated the allegations of the first conduct report:

> On 11-19-2019, I, Investigator P. Prulhiere, found sufficient evidence to submit formal charges for an incident that occurred on October 20, 2019 at about 9:22 am for Offender Toney Brown 985739 for aiding in assaulting another offender with a weapon resulting in serious bodily injury. See corresponding Report of Investigation of Incident. NO CONFIDENTIAL INFORMANTS WERE USED TO PROVIDE INFORMATION FOR THIS CASE. THE RESULT OF THESE FINDINGS ARE BASED ON INTERVIEWS WITH.THE SUSPECTS, PRIMARILY OFFENDER BROWN, VIDEO EVIDENCE AND THE WEAPON RETRIEVED FROM THE HOUSING UNIT. THE COMPLETE INVESTIGATION RESULTS FOR OFFENDER BROWN ARE CONTAINED IN THE ATTACHED REPORT OF INVESTIGATION. OFFENDER BROWN'S ACTIVITY IN THIS ASSAULT WAS DISCOVERED AS A RESULT OF VIDEO REVIEW. MORE SPECIFICALLY, OFFENDER BROWN WAS FOUND TO BE IN VIOLATION OF INDIANA CODE 35-44.1-2-2(A)(3}/F6 OBSTRUCTION OF JUSTICE FOR ATTEMPTING TO DESTROY OR DISPOSE OF EVIDENCE. AN AFFIDAVIT WAS SUBMITTED TO THE HENDRICKS COUNTY PROSECUTOR, ACCEPPTED AND ENTERED INTO THE HENDRICKS COUNTY COURT ON JANUARY 9, 2020.

Dkt. 6-1 (errors in original).

The Report of Investigation provides:

On November 19, 2019, I, Investigator Pulhiere, completed an investigation of an incident that occurred on October 20, 2019 at about 9:22 am. As reported in the facility incident report, an Offender Brandon Sanquenetti 169042 reported to staff that he had been assaulted by an offender with a weapon. Offender Sanquenetti reported that he received stab wounds to the chest and arms.

2

> During the process of investigation, I was able to determine who the primary suspect of the assault was, Offender Edwin Sims 196933 and a second suspect offender who aided in the disposal of the weapon (19-IYC-0104 Item 1). The second suspect offender who attempted' to dispose of the weapon I identified as Offender Toney Brown 985739.
>
> On surveillance video recorded from the H Unit bed area middle camera, Offender Brown can be seen picking up the weapon (2019-10-20 at about 09:18:26 H Unit middle camera) which had just been dropped by Offender Sims when Sims clearly attempted to hand the weapon to Brown. Offender Brown then quickly walked into the latrine where he walked off camera into the toilet area of H Unit latrine. The weapon was retrieved from the second toilet from the urinals in the H Unit latrine during a search of the latrine.
>
> I conducted interviews with all three of the above offenders. The interviews indicated that a weapon was used and that the item I observed picked up by Offender Brown was the weapon used against Offender Sanquenetti. I conducted an interview with Offender Brown after notifying him of his Miranda Rights on October 29, 2019 at about 8:09 am. During the interview, Brown admitted that he picked up the weapon. Brown claimed that for the safety of the housing unit, he picked up the weapon and threw it into the trashcan in the Housing Unit latrine.
>
> As a result of those interviews, video and physical evidence collected from the unit, there is sufficient evidence to charge Offender Brown with aiding in the assault on another offender with a weapon resulting in serious bodily injury. All offender interviews are considered confidential. A photo of the weapon was provided to DHB. The investigation materials outside of those supplied with this report are considered confidential and are maintained in case file 19-IYC-0104. THIS INVESTIGATION FOUND THAT OFFENDER BROWN VIOLATED IC 35-44.1-2-2(A)(3) OBSTRUCTION OF JUSTICE.

Dkt. 6-2.

Mr. Brown was screened for the re-hearing on February 2, 2020. Dkt. 6-3. He pled not guilty, asked for three witnesses, and requested the video evidence. *Id.*

Prior to the disciplinary hearing, the video evidence was reviewed, and a written report was made. This report states:

> At 09:05:37 on HUS H unit front 3/4 camera, offender Sanquenetti is seen approaching the bedarea of H4-04 in the aisleway. It then appears that he is talking to offender Sims who is sitting in a chair between bunks H4-04 and H4-05. At 09:05:44, offender Sanquenetti appears to begin to walk away, but stops as offender

Sims stands up from the chair. The two then appear to be arguing. At 09:05:51, offender Sanquenetti balls up both fists, and appears to make a fighting motion with his hands, but doesnt actually make throws towards anyone. Sanquenetti begins to walk away quickly as offender Sims steps out into the aisleway and removes his gray sweatshirt.

At 09:05:56 on HUS-H unit middle camera, offender Sanquenetti is seen quickly walking towards the latrine, as he begins looking behind him. At 09:05:59, offender Sims in then seen quickly walking behind Sanquenetti, and then begins to chase Sanquenetti into the latrine. At 09:06:00 on HUS H unit latrine, offender Sims and Sanquenetti enter the latrine, both running, with Sims chasing after Sanquenetti. Offender Sanquenetti then enters the sink side of the latrine, followed by Sims. At 09:06:14, multiple offender begin to gather in the latrine. At 09:06:26, Sanquenetti comes out of the sink side and appears to be returning to the bedarea, in which he stops and turns around and goes back into the sink side of the latrine.

At 09:06:43, Sanquenetti leaves the sink side of the latrine and returns to the bedarea. At 09:06:49, offender Sims steps out of the sink side of the latrine, but then returns back. At 09:07:01, Sims leaves the sink side of the latrine and returns to the bedarea. At 09:07:04, offender Sanquenetti can be seen putting his shirt back on at the bedarea of H4-04.at 09:07:12, offender Sims and Sanquenetti pass each other in the middle aisle, as Sims is returning to his bedarea, and Sanquenetti appears to be walking towards the latrine. It appears the two say something as they pass each other, as Sanquenetti stops, and turns side was towards Sims, and then turns back around.

Sims returns to the chair he was sitting in earlier and Sanquenetti returns to the middle air vent area. He then leaves that area, and goes into the latrine. At 09:08:21, Sanquenetti returns to the bedarea, and approaches the area Sims is at. He the turns around and re-enters the latrine at 09:08:42. Sanquenetti re-enters the bedarea at 09:09:01, and approaches the area Sims is at again, but then turns back around, and enters the latrine again, and then enters the dayroom at 09:09:34 on hush unit dayroom camera. He returns to the latrine at 09:10:10. He then goes back to the area Sims is at, appears to walk by, but then turns back around, stops in front of Sims, and the two appear to begin arguing.

At 09:10:44, Sanquenetti appears to begin walking away, but stops and appears to continue arguing with Sims. At 09:10:52, Sims stands up from the chair he is sitting in and the two continue to be in a heated argument. At 09:12:13, offender Sanquenetti strikes offender Sims with his right closed fist, causing Sims to move backwards and Sanquenetti continues to strike Sims multiple times.at 09:12:30, offender Brown approaches the area at 09:12:34, offender Sanquenetti walks away from the area. At 09:15:27, offender Sims begins to walk towards the latrine, holding what appears to be a white unknown item (possibly a towel, t-shirt).

4

At 09:15:37, offender Sanquenetti returns to the area of H4-05, as offender Sims also begins to return to that area, placing the item near the right side of his face off and on. Offender Sims walks past offender Sanquenetti who is at h4-05 bedarea and Sims goes to the area between H4-03 and H4-04. At 09:16:04, offender Sims begins to walkaway from the area, passing offender Sanquenetti who has now been approached by an unknown black offender, and offender Brown. It then appears the unknown offender and Sanquenetti are in an argument. At 09:16:15, offender Sims enters the latrine and Sanquenetti appears to begin walking away from the unknown offender and Brown. The unknown offender then begins walking towards the middle aisle, as offender Sanquenetti turns around and appears to begin talking to offender Brown. Offender Brown then begins to pace around the area Sanquenetti is in, until he walks away at 09:17:09.

At 09:17:20, offender Brown enters the latrine. At 09:17:48, offender Sims exits the sink side of the latrine, followed by offender Brown and returns back to the bedarea. Once he is in the middle aisle near rows 314, offender Sanquenetti then begins to walk away from the area, and offender Sims runs at Sanquenetti, and appears to strike him with an unknown item at 09:17:58 multiple times. Offender Sims is seen with an unknown item in his right hand, which cannot be identified as to what the item is, but Sims hand is shaped like it is grasping on something, instead of in a clinched ball as if he were striking him with his fists. Offender Sanquennetti then appears to attempt to get offender Sims in a headlock, in which the two then fall onto the bed of H3-05, and continue to be in an altercation. Offender Brown then approaches the area the altercation is still continuing at.

At 09:18:12, offender Sims and Sanquenetti then get free of each other, and Sanquenetti the begins to run into the latrine, as Sims begins to chase after him but stops running and begins walking, but stops at the door of the latrine bedarea and turns back around. At 09:18:21, offender Sanquenetti enters the dayroom and closes the gated door behind him. At 09:18:24, offender Sims and Brown walk past each other in the middle aisleway, and offender Sims sticks his left hand behind him and offender Brown appears to begin to grab the item, in which it gets dropped on the floor.

At 09:18:26, the item can be seen on the floor and at 09:18:27, offender Brown can be seen crouched down, grabbing the item off the floor with his left hand. Offender Brown then quickly walks to the sink side of the item with his left hand cluctched as he is holding onto the item. At 09:18:42 Offender Sanquenetti is seen at the dayroom door sloutched over, as officer then open the door and he enters the hallway as officers enter the dayroom.

It then appears as the unit is told to bunk up, as the offenders in the dayroom begin standing up and going towards the bedarea. Offender Brown then exits the sink side of the latrine at 09:19:43, and he returns to his bed, and then goes and approaches offender Sims who is at the bedarea of H4-05. At 09:20:30, offender Sims gets on

5

>his bunk (H4-04u) as an officer approaches the area and begins to look around the floor.
>
>An additional officer then begins to stay in the area of H4-05 in the aisleway where the incident took place. Offender Sims continues to stay on his bunk, but moves his body to where the officers cant see his face (facing away from them, then lays on his back with his left leg folded over his right knee as he places the white unknown item near his face off and on, and then sits up with his back to the officer.
>
>At 09:27:01, additional officers arrive to the area where the incident took place. Officers then begin to pack the propery belonging to offender Sanquenetti. It then appears as the entire unit it told to go into the dayroom as the unit is then searched.

Dkt. 6-9 (errors in original; case converted from all capital; paragraph breaks added).

The first witness Mr. Brown asked to provide a statement is offender Edwin Sims, who was in the altercation at issue, and was asked, "Did [Mr. Brown] have anything to do with this?" Mr. Sims' one-word written response was "No." Dkt. 6-6.

The second witness for Mr. Brown was offender Malcolm Crim, who was asked the same question. In his written statement, Mr. Crim answered, "Hell no." Dkt. 6-5.

Mr. Brown's third witness was Brandon Sanquenetti, the offender who struck and fought with Mr. Sims. Mr. Sanquenetti was asked two questions: (1) Did he put his hands on you?; and (2) Was he trying to break you two up? Mr. Sanquenetti refused to answer either question. Dkt. 6-7.

A disciplinary hearing was held on February 10, 2020. Mr. Brown's statement at the hearing was "This isn't the original conduct report or investigation report." The disciplinary hearing officer (DHO) considered Mr. Brown's statement, staff reports including a confidential investigative report, the evidence (statements) from the requested witnesses, the photograph of the weapon, and the video evidence. Dkt. 6-8. The DHO assessed Mr. Brown guilty of the charged offense and imposed sanctions that included the loss of earned credit time. *Id.*

Mr. Brown appealed to the Facility Head and the IDOC Final Reviewing Authority, but both appeals were denied. Dkt. 6-11; dkt. 6-12. He then brought this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondent has filed a return (brief in opposition to habeas corpus relief) and the disciplinary record. Dkt. 6. Mr. Brown did not file a reply.

**C.     Analysis**

Mr. Brown raises three arguments in support of habeas corpus relief. First, he argues that he was denied due process when he was not allowed exculpatory witness statements and statements from other requested witnesses. Dkt. 1 at 2. Second, Mr. Brown argues that the DHO was not impartial. *Id.* Third, Mr. Brown argues that the DHO violated IDOC policies and procedures when Investigator Prulhiere was allowed to re-write his conduct report for the re-hearing. *Id.* at 3.

**1.     Ground One**

Mr. Brown argues that the DHO failed to explain why the witnesses did not appear in person to provide testimony instead of appearing through a written statement. He also argues that the DHO failed to identify an unknown witness that he had requested. *Id.* at 2.

In the screening report for this disciplinary rehearing, Mr. Brown's request for witnesses provides the name and IDOC numbers of two witnesses – Mr. Sims and Mr. Sanquenetti – with the question that Mr. Brown wanted them to answer. Under these names was: "3rd witness to be brought over by 1pm 2-4-2020." Below that instruction, in different handwriting, was "Crim, Malcolm #189948: Did he have anything to do with this?", and the notation "brought 3rd witness at 1:00 pm on 2-4-20," and signed by L. Hunter. Dkt. 6-3.

The respondent argues that if it was error to fail to produce the witnesses for live testimony, any such error was harmless, and that the unidentified witness was identified and also provided a statement. Dkt. 6 at 10.

7

An inmate "facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 566. "Inmates have a due process right to call witnesses at their disciplinary hearings when doing so would be consistent with institutional safety and correctional goals." *Piggie v. Cotton*, 344 F.3d 674, 678 (7th Cir. 2003) (citing *Wolff,* 418 U.S. at 566). Live testimony is preferred over written statements. *Whitlock v. Johnson*, 153 F.3d 380, 388 (7th Cir. 1998) ("We are . . . unconvinced by the prison's assertion that its policy of interviewing requested witnesses and summarizing their testimony in an unsworn report is a legitimate means of 'calling a witness' even when live testimony would be feasible."); *see also Doan v. Buss*, 82 F. App'x 168, 170-71 (7th Cir. 2003) (rejecting the contention that "under *Wolff* oral testimony is not required as long as written statements are obtained").

The record shows that Mr. Brown's three witnesses were asked for statements about Mr. Brown's involvement in the altercation; two provided curt responses and the third refused to answer questions. Dkts. 6-5, 6-5, & 6-7. The unknown witness that Mr. Brown asked to be identified was found, Mr. Crim, and he is one of the witnesses who provided a statement. In this sense, Mr. Brown was not denied requested witnesses. In the sense of being denied live witnesses, there is no indication that Mr. Brown requested that the witnesses personally appear, but more importantly, there is no reason provided in the record as to why statements were obtained rather than bringing the witnesses to the hearing for live testimony.

The Court does not need to decide whether Mr. Brown was denied due process. He does not present argument or evidence of what the witnesses would have testified to had they appeared in person. Therefore, if there was error for failing to provide for the witnesses to give live testimony, that error was harmless. As the respondent argues, the harmless error doctrine is

applicable to prison disciplinary cases. *Piggie*, 344 F.3d at 678 (holding that harmless error analysis applies to due process violations in prison disciplinary habeas corpus cases). Therefore, habeas corpus relief on ground one is **denied**.

### 2. DHO Impartiality

Mr. Brown argues that the DHO was "possibly biased" because he was influenced by Investigator Prulhiere re-writing the conduct report after the first disciplinary hearing was sent back for a rehearing. He also argues that the DHO was biased because the Investigator wrote into the report that an affidavit about the incident had been accepted by a state court for a criminal prosecution. Dkt. 1 at 2.

A prisoner in a disciplinary action has the right to be heard before an impartial decisionmaker. *Hill*, 472 U.S. at 454. A "sufficiently impartial" decisionmaker is necessary in order to shield the prisoner from the arbitrary deprivation of his liberties. *Gaither v. Anderson*, 236 F.3d 817, 820 (7th Cir. 2000) (per curiam). Hearing officers "are entitled to a presumption of honesty and integrity" absent clear evidence to the contrary. *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003); *see Perotti v. Marberry*, 355 F. App'x 39, 43 (7th Cir. 2009) (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Indeed, the "the constitutional standard for impermissible bias is high," and hearing officers "are not deemed biased simply because they presided over a prisoner's previous disciplinary proceeding" or because they are employed by the IDOC. *Piggie*, 342 F.3d at 666. Instead, hearing officers are impermissibly biased when, for example, they are "directly or substantially involved in the factual events underlying the disciplinary charges, or in the investigation thereof." *Id.* at 667.

There is no argument or evidence that the DHO was *substantially* involved in any of the underlying events or that he aided in the investigation. There is no suggestion that the DHO was a

9

relative of any fact witness to the events or anyone who gave evidence for the disciplinary hearing. With the presumption of honesty and integrity applied, there is not "clear evidence" to show that the DHO was impermissibly biased. Habeas corpus relief on ground two is **denied**.

### 3. DHO Violated IDOC Policies and Procedures

Mr. Brown's third and final ground for relief argues that the DHO failed to follow IDOC policies and procedures when he allowed the conduct report to be re-written for the disciplinary rehearing. Dkt. 1 at 3. Unfortunately for Mr. Brown, the violation of state laws or state policies, regulations, guidelines, or procedures does not violate federal constitutional due process rights. *See Sandin v. Conner*, 515 U.S. 472, 481-82 (1995) (prison policies, regulations, or guidelines do not constitute federal law; instead, they are "primarily designed to guide correctional officials in the administration of a prison . . . not . . . to confer rights on inmates").

Relief pursuant to § 2254 is available only on the ground that a prisoner "is being held in violation of federal law or the U.S. Constitution." *Caffey v. Butler*, 802 F.3d 884, 894 (7th Cir. 2015). Claims based on prison policy, such as Mr. Brown's, are not cognizable and do not form a basis for habeas relief. *See Keller v. Donahue*, 271 F. App'x 531, 532 (7th Cir. 2008) (rejecting challenges to a prison disciplinary proceeding because, "[i]nstead of addressing any potential constitutional defect, all of [the petitioner's] arguments relate to alleged departures from procedures outlined in the prison handbook that have no bearing on his right to due process"); *Rivera v. Davis*, 50 F. App'x. 779, 780 (7th Cir. 2002) ("A prison's noncompliance with its internal regulations has no constitutional import—and nothing less warrants habeas corpus review."); *see also Estelle v. McGuire*, 502 U.S. 62, 68 at n.2 (1991) ("[S]tate-law violations provide no basis for federal habeas relief."). Accordingly, habeas corpus relief on Mr. Brown's third ground for relief is **denied**.

### D. Conclusion

"The touchstone of due process is protection of the individual against arbitrary action of the government." *Wolff*, 418 U.S. at 558. There was no arbitrary action in any aspect of the charge, disciplinary proceedings, or sanctions involved in the events identified in this action, and there was no constitutional infirmity in the proceeding which entitles Mr. Brown to the relief he seeks. Accordingly, Mr. Brown's petition for a writ of habeas corpus is **denied** and this action is **dismissed** with prejudice. Final judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 5/11/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Toney Brown
985739
Pendleton Correctional Facility
Inmate Mail/Parcels
4490 West Reformatory Road
Pendleton, IN 46064

Monika P. Talbot
Indiana Attorney General
monika.talbot@atg.in.gov